Anthony **TARANTO**, Plaintiff,

v.

**UNITED STATES LINES**, Defendant and Third-Party-Plaintiff,

v.

**M. P. HOWLETT, INC.**, Third-Party-Defendant.

Civ. A. No. 15668.

United States District Court
E. D. New York.
Nov. 13, 1959.

Gallo & Brady, New York City, for plaintiff, Joseph Davis, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendant and third-party plaintiff, Matthew Danahar, New York City, of counsel.

Dorsey, Burke & Kaber, New York City, for third-party defendant, Morgan J. Burke, Jr., New York City, of counsel.

ABRUZZO, District Judge.

The plaintiff, a longshoreman, instituted this action against the United States Lines to recover damages for personal injuries sustained on December 4, 1953, while working aboard the vessel S.S. American Press. He contends that his accident was the result of negligence on the part of the defendant steamship company in failing to provide him a safe place within which to work and because of the unseaworthiness of the vessel. The defendant impleaded M. P. Howlett, Inc., the plaintiff's employer. In the impleader the defendant alleges that any injuries sustained by the plaintiff were caused by reason of Howlett's breach of warranty to perform its stevedoring operations in a safe, careful, prudent and workmanlike manner and that any unsafe condition which may have existed at the time of the accident was caused by the active and primary negligence on the part of Howlett.

### Facts

The plaintiff, a man weighing some 202 pounds, at the time of the accident had been employed by Howlett for 22 or 23 years, first as a longshoreman, and as a foreman for 15 or 16 years. At the time of the accident the plaintiff and his men were working in hatch No. 1. There is testimony that normally the pontoons taken from the No. 1 hatch were placed on the port side but, as there was dunnage on that side, the pontoons were placed on the starboard side. There is some dispute as to the amount of dunnage but at most there were 5 or 6 drafts of lumber of different sizes. They ran from 6 to 12 feet long and were from 4 to 4½ feet wide and 3 or 3½ feet high. The dunnage extended to the hatch rail and close to the coaming and then extended aft toward the No. 2 hatch. It is conceded the vessel was responsible for the dunnage at this hatch.

The plaintiff testified that the dunnage blocked the space between the No. 1 hatch and the No. 2 hatch completely. Because of the dunnage there was no space within which to walk at the forward end of the No. 1 hatch nor at the after end.

While his gang was working in hatch No. 1 the plaintiff remained on deck and because of the condition of the dunnage he was compelled to walk on top of the dunnage on several occasions. At about 10:30 p. m. while so walking on top of the dunnage at or near the after end of the hatch No. 1 this dunnage slipped from under his feet and he fell to the deck. He felt some pain in his back and sat on the deck for 10 or 15 minutes when his assistant came over and picked him up. He did not work for an hour or an hour and a half but went back to watch the operations of his gang. The next day being Sunday he did not work but returned to work on Monday, although he had pain in his back. He worked for one to three weeks and it was not until three or four weeks after the accident that he saw a physician for the first time, a Dr. Feldman, who referred him to a Dr. Trynan.

A witness, Joseph Taranto, unrelated to the plaintiff, testified that there was 1½ to 2 feet of clear deck space to walk through between hatch No. 1 and hatch No. 2. The other witnesses called by the plaintiff testified that there was a large quantity of dunnage in the area of hatch No. 1 but could not pinpoint whether there was any clear deck space without dunnage between hatch No. 1 and hatch No. 2.

Daniel Jenkins, called by the plaintiff, testified that there was 15 inches of clear deck space.

Bosun Barria in a deposition testified that there was a clear space between hatch No. 1 and hatch No. 2. Second Officer Buschman's testimony at the trial on this particular issue corroborated the Bosun.

The question of liability hinges and depends upon whether or not the plaintiff had sufficient clear deck space to

walk between hatch No. 1 and hatch No. 2 for his contention is that there was none, necessitating his standing on top of the bundles of dunnage. As the testimony favorable to the plaintiff is dependent to a great extent upon the credibility of the plaintiff, whose testimony was sharply disputed as to walking space between hatch No. 1 and hatch No. 2, it is necessary in evaluating his testimony to make reference to the testimony plaintiff gave with respect to the nature of his injury and the extent thereof.

Plaintiff testified that due to this back injury he was unable to work from the day of the accident practically until the date of trial and that he could not walk for more than 10 or 15 minutes at a time without the aid and use of a cane. When Dr. Trynan examined the plaintiff for the first time he ordered X-rays and a steel brace. Dr. Trynan gave plaintiff injections and "radio" treatment. He was in the Neurological Institute of Columbia Presbyterian Center where he remained 11 or 12 days and a month thereafter again returned to the Neurological Institute for treatment. In January, 1959, he was admitted to Maimonides Hospital in Brooklyn where he remained for 9 or 10 days. These doctors did not find any evidence of a fracture and testified that the plaintiff was suffering from a neurological injury to his back. In answer to a hypothetical question they testified that in their opinion the accident was a competent producing cause for the back injury claimed by the plaintiff.

With respect to the plaintiff's testimony that he limps and cannot bend and needs the use of a cane, moving pictures taken of the plaintiff on December 16, 1957 (Deft's Ex. R and U), and others taken on May 8, 1959 (Deft's Ex. T), demonstrated that the plaintiff not only walked without a limp but walked across the street at a rapid gait, and could bend and pick up a heavy hawser on a dock, as well as climb fences. The testimony further developed that the plaintiff was involved in an automobile accident on September 19, 1957. He testified that he was not making any claim with respect to an injury to his back in a lawsuit that was then pending in the Supreme Court, State of New York, as an outgrowth of that accident. Plaintiff identified a bill of particulars dated August 28, 1958, furnished to the defendant, in the Supreme Court action which was introduced in evidence as Defendant's Exhibit Q. This exhibit showed that he was claiming an aggravation of a pre-existing back condition and that as a result of that accident was totally disabled for a period of two months and thereafter continued to be partially disabled, and at the time of the trial still experienced a great deal of pain, discomfort and disability.

The credibility of the plaintiff's testimony is sharply at issue both as to the clear deck space between hatch No. 1 and hatch No. 2 and the nature and extent of his injuries.

Joseph Taranto, Jenkins, Bosun Barria and Second Officer Buschman's testimony is contradictory to the plaintiff's claim of the lack of deck space to walk on between hatch No. 1 and hatch No. 2. The plaintiff is an interested witness on his own behalf while these witnesses seem not to be interested witnesses. This Court accepts their testimony rather than the plaintiff's. The plaintiff is not worthy of belief.

The plaintiff's testimony with regard to his injuries indicates clearly that he has exaggerated to a great extent the nature and permanent result of these injuries.

This Court, therefore, finds that there was no negligence on the part of the vessel and that the vessel was not unseaworthy.

The United States Lines, defendant and third-party plaintiff, is entitled to a decree against the plaintiff. In view of this decision, the question of liability as between the defendant, United States Lines, and the third-party defendant, M. P. Howlett, Inc., has become academic and moot.

Findings of fact, conclusions of law and a decree must be entered within 15 days from the date of this decision.